LAWRENCE PRESTON REDMOND et al., complainants-respondents,

*v.*

NEW JERSEY HISTORICAL SOCIETY, defendant-appellant.

LAWRENCE PRESTON REDMOND et al., ·complainants-appellants,

*v.*

NEW JERSEY HISTORICAL SOCIETY, defendant-respondent.

[Argued October 27th, 1941.  Decided September 18th, 1942.]

*Messrs. Lindabury, Depue & Faulks* and *Mr. James F. Curtis* (a member of the New York bar) (*Mr. James F. Curtis, Mr. Herbert M. Ellend* and *Mr. Richard G. Moser,* of counsel), for the complainants.

*Messrs. Pitney, Hardin & Skinner* (*Mr. Frederick Frelinghuysen,* of counsel), for the defendant.

The opinion of the court was delivered by

PERSKIE, J.

The sole issue in these consolidated cases is: Who is presently entitled to the exclusive right of possession of the portrait of Captain James Lawrence, which was painted by an illustrious early American artist, Mr. Gilbert Stuart? Is it the complainants who are the only descendants (great, great grandchildren) of Captain Lawrence? Or is it the defendant, the New Jersey Historical Society (hereafter called Society), which has had open possession of the portrait since January, 1888?

The facts are stipulated. Captain James Lawrence was a native of New Jersey. (He was born in Burlington on October 1st, 1781.) He was a distinguished American naval officer in the War of 1812 and the author of the famous

command "Don't give up the ship." (He died in 1813 from wounds received on the ill-fated *Chesapeake.*)

The portrait was in the possession of and apparently owned by one Mary Lawrence Redmond (hereafter called Mrs. Redmond), the sole surviving grandchild of Captain Lawrence, at the time of her death. She died in Newport, Rhode Island, on November 11th, 1887, leaving her surviving her son, William Preston Redmond (hereafter called Preston), who was then 14½ years of age. By her will (October 15th, 1887); probated in Rhode Island, on December 12th, 1887, she devised and bequeathed all her property:

"* * * unto my son William Preston Redmond and his heirs; provided always, that the gifts and directions expressed in a memorandum heretofore made by me and now attached hereto shall be faithfully carried out and performed by my executors; and also that if my said son shall die leaving no descendants, the 'Prize Silver' shall go and is hereby bequeathed to the next of kin of Lawrence blood and the portrait by Stuart shall go and is hereby bequeathed to The New Jersey Historical Society."

The portrait referred to is the portrait which is the subject-matter of this suit. The memorandum referred to is not made to appear because it was not found.

In January, 1888, one of the executors named in Mrs. Redmond's will delivered the portrait to the defendant Society and it has remained in the possession of the Society since that time.

In 1938, Mrs. Redmond's son, Preston, died in Wyoming leaving him surviving a widow and three children, all of whom are the complainants herein. By his will, Preston devised and bequeathed "all of his property to his wife" (Ida S. Redmond), and upon her death, he bequeathed the "remainder" to his "three children" (Gertrude McCain, Dorothy Redmond and Lawrence Redmond) share and share alike. The portrait was not mentioned in the will. Ida S. Redmond, individually and as executrix of her husband's estate, assigned and transferred all her interest in and to the portrait to her three named children. Hereafter the word "complainants" shall refer to the children.

Shortly after the death of Preston, complainants, on August 26th, 1938, demanded the portrait from the Society. The demand was refused. Whereupon complainants filed a bill in Chancery, on March 28th, 1939, in the nature of an equitable replevin, to recover the portrait in specie. The unchallenged jurisdictional theory of the bill is, as alleged, "that the portrait is in all respects, a *pretium affectionis.*" *Burr* v. *Bloomsburg, 101 N. J. Eq. 615; 138 Atl. Rep. 876.* The alleged meritorious theory of the bill is that, under the will of Mrs. Redmond, or under the wills of Mrs. Redmond and Preston, "title to said portrait vested in complainants in fee-simple indefeasible," and that complainants are, therefore, presently entitled to the exclusive right of possession thereof.

The theory of the Society, in resisting complainants' claim to the portrait, is that whatever interest Preston had in the portrait was bequeathed to him by Mrs. Redmond, that complainants' interest in the portrait was bequeathed to them by Preston and not by Mrs. Redmond. Pursuant to that theory, the Society makes clear that it does not base its defense upon the executory bequest of the portrait to it under Mrs. Redmond's will. Of the several defenses it had set down, the Society finally chose to base its defense, to whatever the interest of Preston or complainants to the portrait may be, upon the "statute of limitations and laches," as a bar to complainants' right of recovery.

In light of the issues thus raised, the learned Vice-Chancellor advised a decree which was entered and which provided, *inter alia,* that, by virtue of the provisions of the will of Mrs. Redmond and the will of Preston, title to the portrait vested in complainants in fee-simple, subject to being divested by a gift over in fee to the Society if at any time there shall be no descendants of Preston, and that neither the statute of limitations nor laches barred complainants.

Neither side is satisfied with the decree. The cases are before us on cross-appeals.

Briefly stated, complainants contend, in substance, that, in failing to adopt their theory of the cause, the decree entered erroneously placed a cloud upon their title to the portrait,

and that they are, therefore, entitled to an adjudication, by this court, resulting in the elimination of the provision that complainants' title "is subject to be divested by a gift over to defendant if at any time there shall be no descendants of the said William Preston Redmond." The Society, on the other hand, contends that it is entitled to an adjudication resulting in a dismissal of the bill and the entry of a decree in its favor.

1. We hold that complainants are entitled to the relief they seek.

Before discussing the reasons upon which we base our holding, we desire to make several observations. Our holding is based, under the circumstances exhibited, upon the unquestioned. assumption that the applicable common law principles of our state also prevail in the State of Rhode Island (*Cf. Reingold* v. *Reingold, 115 N. J. Law 532, 534; 181 Atl. Rep. 153*) where Mrs. Redmond died, where her will was probated, and where the law of her domicile controlled the disposition of the portrait under the will.

It is the settled law that in an action of equitable replevin, as in an action at replevin at law, the possession of the portrait by the Society since 1888, or since Preston became of age (in 1894) is *"prima facie* evidence" of its ownership (*Cf. Burr* v. *Bloomsburg, supra* (at *p. 625*)), but *"*it is not conclusive." *Nelson* v. *Bock, 84 N. J. Law 123; 85 Atl. Rep. 1009.* The burden is on complainants properly to establish ownership—absolute or qualified—and the right to exclusive possession where such ownership is denied. *Pintenics* v. *Menwig, 113 N. J. Law 4, 5; 172 Atl. Rep. 377; Kleinfeld* v. *General Auto Sales Co., 118 N. J. Law 67, 71; 191 Atl. Rep. 460; 110 A. L. R. 350.* Complainants' right of recovery is necessarily based upon the strength of their title to the portrait rather than upon the weakness of the Society's title thereto. *Cf. Chambers* v. *Hunt, 18 N. J. Law 339, 345.*

With these prefatory observations, let us turn to the will of Mrs. Redmond, the source of complainants' strength of title. What were Mrs. Redmond's apparent or presumed intentions? If the ordinary meaning given to the words of her will (there is nothing to indicate that she intended that

a contrary meaning be given them) clearly expresses her intentions, and if her intentions are "not in violation of any principle of law," her intentions are "to govern without any further inquiry or regard to mere technical terms." *Kent* v. *Armstrong, 6 N. J. Eq. 637, 638; Garabrant* v. *Callaway, 113 N. J. Eq. 424, 428; 167 Atl. Rep. 1.*

As we have already observed, Mrs. Redmond first gave all of her property (which necessarily included the portrait in question) to her son Preston "and his heirs." Standing alone no clearer words could have been used by her to express her intentions, to convey a fee-simple of her realty, if any, she possessed, and to make a gift absolute and forever of her personalty. We must, however, continue to read and study her will to the end of ascertaining whether we can find, in any other part thereof, other words showing a contrary intention. Unless we can find such a contrary intention, we are obliged to hold that title to the portrait passed to Preston absolutely and forever. *Cf. Executors of Wintermute* v. *Executors of Snyder, 3 N. J. Eq. 489, 494; Fidelity Union Trust Co.* v. *Farley, 127 N. J. Eq. 346, 349; 13 Atl. Rep. (2d) 313; affirmed, Fidelity Union Trust Co.* v. *Stridsberg, 129 N. J. Eq. 386; 19 Atl. Rep. (2d) 460.*

Obviously, we must disregard the words relating to the memorandum. That memorandum, as we have seen, was not found. The record is barren of any proof as to its contents. We do not know what it contained and are not privileged to guess.

We next come to the words relating specifically to the "portrait." Here Mrs. Redmond attempts to treat only with the contingency "if my said son shall die leaving no descendants."

What did Mrs. Redmond mean by the word "descendants?" Generally, the word "descendants" in a will "signifies children, grandchildren and other issue to the remotest degree." *Cf. Sanford* v. *Kaercher, 126 N. J. Eq. 391, 393; 9 Atl. Rep. (2d) 50; affirmed, 127 N. J. Eq. 277; 12 Atl. Rep. (2d) 676; Thompson on Wills (2d ed.) 358, 359 § 279.* "While children are descendants, descendants are not always children * * *." For the word "descendants * * * is

a broader term than children and includes all lineal heirs in the direct descending line from the person or all who proceed from his body." It is "practically synonymous with issue in its legal meaning." It means "such descendants as will take the estate in lieu of parents under the laws of descent and distribution." *Thompson, Wills, supra.* We search the will in vain for any words indicating that Mrs. Redmond used the word "descendants" in any other than its usual and ordinary meaning, to wit, "issue." *Cf. Weehawken Ferry Co.* v. *Sisson, 17 N. J. Eq. 475, 486.*

When did Mrs. Redmond intend to fix the time to determine whether Preston died leaving no "descendants" within the aforesaid stated meaning of the word? Did she intend that a definite failure of issue construction be given to the words? If she did, such a construction would fix the time, definitely and finally, at Preston's death. *Cf. Woodward* v. *Woodward, 16 N. J. Eq. 83.* Or did she intend that an indefinite failure of issue construction be given to her words? If she did, such a construction would fix the time whenever Preston's line of descendants had run out or had become extinct. *Cf. Condict's Ex'rs* v. *King, 13 N. J. Eq. 375.*

But if an indefinite failure of issue construction were given to the words "leaving no descendants," the gift over of the portrait to the Society is utterly void; it definitely trenches upon the rule against perpetuities which is aimed at "remoteness" and "unlawful postponing of vesting of estates," real and personal. *Cf. Camden Safe Deposit and Trust Co.* v. *Scott, 121 N. J. Eq. 366, 370, 371; 189 Atl. Rep. 653; 110 A. L. R. 1442.* For when, as here, a gift is made in the first instance to an individual and then over to a charity upon a contingency which may not occur, within the time limit of the rule, the gift over is invalid. It is the classic exception to the commonly and too broadly stated principle that the rule against perpetuities does not apply to a gift to charity. *Gray on Rule Against Perpetuities (3d ed.) 473 et seq.* §§ *591 et seq.; 3 Scott on Trusts (1929) 2137 § 401.7; Perry on Trusts (1929) (7th ed.) 643 § 384; 2 Bogert on Trusts (1935) 1068 § 345; 1 Tiffany on Real Estate (enlarged ed.) 617 § 187; Thompson, Wills, supra (at p. 549) § 457;*

Professor W. Borton Leach ("Perpetuities in a Nut Shell"), *51 Harvard Law Review 638, 668, 669; Cf. Brooks v. Belfant, 90 Me. 318; 38 Atl. Rep. 222, 224; Institute for Savings v. Roxbury Home for Aged Women, 244 Mass. 583; 139 N. E. Rep. 301, 302; Talbot v. Rigg, 287 Mass. 144; 191 N. E. Rep. 360, 361.* The cases on which a contrary result was reached below are clearly distinguishable on the facts.

We need not, however, labor this point because we are satisfied that it was Mrs. Redmond's intention that a definite failure of issue construction be given to the words "leaving no descendants" in her will. (*Cf. Rhode Island Laws of 1896 ch. 202 § 4,* and *N. J. S. A. 3:2-17,* presently requiring that the definite failure of issue construction be applied.) The word "leaving" is the key to Mrs. Redmond's intent. *Cf. Woodward v. Woodward, supra* (at *p. 86*). If Preston left descendants he had to leave them at the time of his death. He left them then or never. The unquestioned fact here is that Preston died leaving descendants-complainants herein. The contingency which Mrs. Redmond had in mind, viz., that Preston might die "leaving no descendants" was based upon a definite event, to be determined at a definite time, namely, at Preston's death. *Cf. Wallington v. Taylor, 1 N. J. Eq. 314, 318; Brooks v. Kip, 54 N. J. Eq. 462, 468; 35 Atl. Rep. 658; affirmed, 55 N. J. Eq. 590; 39 Atl. Rep. 1113.* That definite contingency, that definite event did not come to pass at the definite time fixed and no longer can it ever come to pass since the contrary has happened.

In fine, we hold that Preston acquired or took title to the portrait under his mother's (Mrs. Redmond's) will absolutely and forever subject only to the contingency, to the definite event which, as pointed out, can never happen.

In light of our holding, and in light of the assignment by Preston's widow of her interest in the portrait to complainants, her children, it follows that complainants, as legatees under the will of Preston, their father, acquired or took title to the portrait absolutely and forever. And, unless barred by the asserted defenses, complainants are presently entitled

to the exclusive right of possession to the portrait free from any cloud upon their title thereto.

2. We are met at the threshold of our consideration and determination of the defenses asserted by the Society, with the interesting question touching the acquiring of title to chattels by adverse possession. Counsel have cited no case in our state on the point and we have not been able to find one. The point is one of first impression with us.

By the great weight of authorities elsewhere, it is settled that "the law relating to adverse possession of chattels, while differing in some respects from that which relates to adverse possession of lands, bears a close analogy thereto. Under the statutes governing the subject title to chattels may be lost or acquired by adverse possession." *2 C. J. 285 § 634; Cf. 2 C. J. S. "Adverse Possession" § 236; 1 Am. Jr. 845 § 96.*

The classic discussion of the subject will be found in an article (in three parts) by Dean James Barr Ames on "The Disseisin of Chattels," reported in *3 Harvard Law Review* (at *pp. 23 et seq.;* at *pp. 313 et seq.*), ("The Nature of Ownership"), and (at *pp. 337 et seq.*), ("Inalienability of Choses of Action"). The article ("The Nature of Ownership," *supra*) will also be found in *3 Selected Essays on Anglo-American Legal History 156,* &c., reprinted in Ames *Lectures on Legal History 192 et seq.,* and abstracted in part by Dean John C. Wigmore, in Wigmore's *1 Select Cases on Torts 707.* Dean Ames, in fully considering this question, contrasts the Roman and the English laws on the subject. He persuasively demonstrates, by a wealth of authorities, that other courts, when considering personalty, have consistently applied the same rules of law concerning the necessary requisites of adverse possession that they applied when considering the question of adverse possession of realty. The basis for this like application of principle is, in our opinion, sound and just. We adopt it.

We proceed accordingly to a consideration of the applicable principles. A party relying on a title by adverse possession has the burden of proving "all the facts necessary to establish such a title." *1 Am. Jr. 925 § 237; Cohn v. Plass, 85 N. J. Eq. 153; 95 Atl. Rep. 1011.* That proof must be made out

"clearly and positively, by a preponderance of evidence." *Mason* v. *Home Real Estate Co., 90 N. J. Eq. 455, 456; 108 Atl. Rep. 4. Cf. Northern Railroad Company of New Jersey* v. *Demarest, 94 N. J. Law 68; 108 Atl. Rep. 376.*

The facts necessary to establish title by adverse possession are settled. The possession cannot be founded upon "permission;" it must be "hostile as well as actual, visible, exclusive and continuous." *Wittke* v. *Wittke, 102 N. J. Law 176; 130 Atl. Rep. 598; Cf. Myers* v. *Folkman, 89 N. J. Law 390; Folkman* v. *Myers, 93 N. J. Eq. 208; 115 Atl. Rep. 615; Leigh* v. *Howard, 87 N. J. Law 113; 93 Atl. Rep. 680; DeLuca* v. *Melin, 103 N. J. Law 140; 134 Atl. Rep. 735.* It must be "adversary," it "must begin and continue, for the whole term, in hostility." *Content* v. *Dalton, 122 N. J. Eq. 425, 430, 431,* and cases there cited, *194 Atl. Rep. 286; 112 A. L. R. 1031.*

What is the character of the Society's possession of the portrait?

Complainants contend that the Society's possession is the result of a "voluntary bailment or gratuitous loan" of the portrait. If that be so, *i. e.,* if it were the result of a loan, the Society concedes that its defenses must fail (and that would be so, if it were the result of a voluntary bailment), but it denies that the proofs support such claims. The Society takes the position that the delivery of the portrait by the executor, the receipt thereof by the Society, the Society's claims thereto, each constituted a conversion of the portrait and started the running of the statute (*N. J. S. A. 2 :24-1*), if not in 1888 when the acts were committed then in 1894 when Preston became of age (*N. J. S. A. 2 :24-4*), "as effectively as if [the Society] had refused to deliver the portrait to Preston on demand;" and that since Preston would have been barred from recovering the portrait after 1900, complainants, his children, are likewise barred.

We do not agree with these contentions. There is nothing in the stated acts of the executor or the Society to justify a "repudiation" by the Society of Preston's right to the portrait or to justify the conclusion that the Society exercised dominion over the portrait "inconsistent" with Preston's right to the portrait, or that the Society did "some act" which

had the "effect of destroying or changing the quality * * *" of the portrait. *Cf. Farrow* v. *Ocean County Trust Co., 121 N. J. Law 344, 348,* and cases there collated; *2 Atl. Rep. (2d) 352.* Although the Society claims that it had no occasion "to believe that it was not the owner of the portrait," it concedes that "no affirmative claims of title thereto (of ownership thereto), as such, were made" by it. *Cf. Campbell* v. *Holt, 115 U. S. 620; 29 L. Ed. 483.* The Society's records bespeak no assertion of ownership. The first assertion of ownership by the Society was in 1938, when it refused to deliver the portrait to complainants, and the statute of limitations did not begin to run until that time.

Moreover, the Society utterly failed to prove that its possession of the portrait was "adversary," "hostile." Among the several public announcements made as to its acquisition of the portrait, the Society announced that it had become the "possessor" of the portrait, that the portrait was "bequeathed" to it under "the will and testament of Mrs. Redmond." Obviously, either the Society knew, or, under the circumstances, it was charged with the knowledge (*Cf. The Real Estate-Land Title and Trust Co.* v. *Stout, 117 N. J. Eq. 37, 44, 45; 175 Atl. Rep. 128*) that the only claim it had to the portrait was a contingent claim; it was a claim which under Mrs. Redmond's will, could only have ripened into an absolute right to the portrait in the event that Preston had died "leaving no descendants." Surely Mrs. Redmond's executor who delivered the portrait to the Society, and Preston, were charged with the same knowledge. Thus with like full knowledge on the part of the parties, the portrait was voluntarily delivered to and accepted by the Society. This did not and could not alter the clear provisions of the will. Clearly, the possession of the Society did not begin nor did it continue to be (prior to 1938) in "hostility." Its possession was not "adversary." On the contrary, its possession, in our opinion, was merely "permissive" however otherwise presently characterized by either party, and, therefore, no claim of "adverse possession" can be successfully maintained by the Society. *Wittke* v. *Wittke, supra* (at *p. 179*). We so hold. The statute of limitations did not bar complainants' right of recovery.

3. Nor do we think that laches operated to bar complainants' right of recovery. There is not a scintilla of proof to indicate that Preston had knowledge, or was charged with knowledge that his rights were invaded. He did not know and had no reason to believe that the Society claimed ownership of the portrait, or claimed any greater rights to the portrait than those given to it by Mrs. Redmond's will. *Cf. Hall* v. *Otterson, 52 N. J. Eq. 522; 28 Atl. Rep. 907; affirmed, 53 N. J. Eq. 695; 25 Atl. Rep. 1130; Melosh* v. *Melosh, 125 N. J. Eq. 486; 6 Atl. Rep. (2d) 472.* Nor did his children, complainants, know or have reason to believe that the Society was claiming ownership of the portrait until the Society refused their demand for its return in 1938.

4. We desire, in conclusion, to point out that we have not overlooked the line of cases of which *McCartin* v. *Traphagen's Adm'r, 43 N. J. Eq. 323; 11 Atl. Rep. 156; affirmed, 45 N. J. Eq. 265; 17 Atl. Rep. 809; Soper* v. *Cisco, 85 N. J. Eq. 165; 95 Atl. Rep. 1016,* are typical and which hold that "he who without adequate excuse, delays asserting his rights until the proofs respecting the transaction out of which he claims his right arose, are so indeterminate and obscure that it is impossible for the court to see whether what is asserted to be justice to him is not injustice to his adversary, has no right to relief." *Soper* v. *Cisco, supra* (at *p. 174*). For reasons already discussed this principle is without application to the facts in the case at bar.

We have considered all other points argued and find them to be without merit.

The causes will be remanded to the court below (with costs) and with directions that the decree be modified consistently with this opinion.

*For affirmance*—None.

*For reversal*—CASE, DONGES, WELLS, JJ. 3.

*For modification*—THE CHIEF-JUSTICE, BODINE, HEHER, PERSKIE, PORTER, COLIE, DEAR, RAFFERTY, HAGUE, THOMPSON, JJ. 10.